IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

A.A.,[1]

      Petitioner,

          v.                                                             Civil Action No. 3:26cv301

JEFFREY CRAWFORD, *et al.*,

      Respondents.

## MEMORANDUM OPINION

This matter comes before the Court on four motions by Petitioner A.A. ("Petitioner" or "Mr. A"):

1. Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 (the "Amended Petition"), (ECF No. 14);[2]

2. Motion for Leave to Proceed Under Pseudonym, (ECF No. 19);

3. Motion to Seal Petition, Amended Petition, and Accompanying Exhibits, (ECF No. 21); and,

4. Motion to Seal Exhibit G to Petitioner's Reply in Support of his Amended Petition, (ECF No. 29).

In the Amended Petition, Mr. A challenges his detention by Immigration and Customs Enforcement ("ICE"), arguing that Respondents' revocation of his humanitarian parole and

---

[1] Petitioner seeks, and this Court will grant, leave to proceed under the pseudonym "A.A." or "Mr. A." (ECF No. 19; *see infra* Section II.B.)

[2] The Court employs the pagination assigned by the CM/ECF docketing system.

subsequent detention by ICE deprived him of his constitutional right to due process of law under the Fifth Amendment to the United States Constitution.[3]  (ECF No. 14 ¶¶ 108–123.)[4]

For the reasons articulated below, the Court will grant the Amended Petition, (ECF No. 14), and order Respondents to release Mr. A.  The Court will also grant Petitioner's Motion for Leave to Proceed Under Pseudonym, (ECF No. 19), and Motions to Seal, (ECF Nos. 21, 29).

<strong>I.  Background</strong>

**A.      Legal Background**

**1.       Detention Under 8 U.S.C. §§ 1225 and 1226**

8 U.S.C. § 1225(a) provides that "[a]n alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."  8 U.S.C. § 1225(a)(1).  Section 1225 then divides "applicants for admission" into two categories under §§ 1225(b)(1) and 1225(b)(2).  Relevant here, noncitizens detained subject to § 1225(b)(1) are "ordered removed 'without further hearing or review,'

---

[3] The Fifth Amendment to the United States Constitution provides, in pertinent part:

> No person shall . . . be deprived of life, liberty or property without due process of law.

U.S. Const. amend. V.

[4] Petitioner also asserts claims under the Immigration and Nationality Act ("INA") and the Administrative Procedure Act ("APA").  (ECF No. 14 ¶¶ 124–139.)  Because the Court will grant the Amended Petition on due process grounds, the Court need not and does not address Mr. A's other claims for relief.

Mr. A seeks attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.  (ECF No. 14 ¶ 147.)  Mr. A has no cognizable claim for attorney's fees because a habeas proceeding is not a "civil action" under the EAJA.  *Obando-Segura v. Garland*, 999 F.3d 190, 195–97 (4th Cir. 2021); *Quispe v. Crawford*, No. 1:25-cv-1471 (AJT), 2025 WL 2783799, at *3–4 (E.D. Va. Sept. 29, 2025).

2

pursuant to an expedited removal process." *Jennings v. Rodriguez*, 583 U.S. 281, 303 (2018) (quoting 8 U.S.C. § 1225(b)(1)(A)(i)). Noncitizens detained under § 1225(b)(1) can avoid expedited removal by "indicat[ing] either an intention to apply for asylum . . . or a fear of persecution." 8 U.S.C. § 1225(b)(1)(A)(ii). Pending DHS' "consideration of the application for asylum," the noncitizen "*shall* be detained." 8 U.S.C. § 1225(b)(1)(B) (emphasis added).

As this Court has previously explained, § 1225 covers individuals "'*actively* seeking admission into the country, and not those who have already entered the country.'" *Duarte Escobar v. Perry*, 807 F. Supp. 3d 564, 576 (E.D. Va. 2025) (emphasis in original) (quoting *Quispe v. Crawford*, No. 1:25-cv-1471 (AJT), 2025 WL 2783799, at *5 (E.D. Va. Sept. 29, 2025)). Because individuals detained under § 1225 section are subject to *mandatory* detention, § 1225(b) "does not grant detainees a bond hearing." *Id.* at 579.

8 U.S.C. § 1226, in contrast, establishes "the default rule" for detaining and removing aliens "'already present in the United States.'" *Id.* at 578 (quoting *Jennings*, 583 U.S. at 303). Section 1226(a) provides that, "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Pending the removal decision, the Attorney General may "continue to detain the arrested alien," "release the alien on . . . bond of at least $1,500," or "release the alien on . . . conditional parole." *Id.* § 1226(a)(1)–(2). Thus, individuals subject to detention under § 1226(a) are entitled to a bond hearing.

Sections 1225 and 1226 create a dichotomy: § 1225(b)(2)(A) "covers aliens *seeking admission* to the United States" and § 1226(a) "covers aliens *already present* in the United States." *Duarte Escoboar*, 807 F. Supp. 3d at 578. A detainee seeking bond must therefore

demonstrate that they are detained subject to § 1226, which permits bond determinations, rather than § 1225, which does not.

### 2. Humanitarian Parole Under 8 U.S.C. § 1182(d)(5)(A)

Even if an individual is classified as an alien "seeking admission" subject to mandatory detention under § 1225, the INA provides that an applicant for admission "may be temporarily released on parole for urgent humanitarian reasons or significant public benefit." *Jennings*, 583 U.S. at 288 (quotation omitted). Specifically, 8 U.S.C. § 1182(d)(5)(A) provides that "[t]he Secretary of Homeland Security may . . . in his [or her] discretion parole into the United States temporarily under such conditions as he [or she] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.* Humanitarian parole of an alien subject to mandatory detention "shall not be regarded as an admission of the alien." *Id.*[5] Specifically, "aliens who arrive at ports of entry—even those paroled elsewhere in the country for years pending removal—are treated for due process purposes as if stopped at the border." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (quotation omitted). In other words, humanitarian "parole under § 1182(d)(5)(A) employs a legal fiction whereby non-citizens are legally permitted to enter the country but are nonetheless treated, for legal purposes, as if stopped at the border." *Pineda-Berrios v. Lyons*, 1:25-cv-2332 (LMB), 2026 WL 384159, at *2 (E.D. Va. Feb. 11, 2026) (quotation omitted).

---

[5] The INA further provides in its definitions section that "[a]n alien who is paroled under section 1182(d)(5) . . . shall not be considered to have been admitted." 8 U.S.C. § 1101(a)(13)(B).

4

Humanitarian parole under § 1182(d)(5)(A) is not indefinite. When, "in the opinion of the Secretary of Homeland Security," the "purposes of such parole . . . have been served," the noncitizen "shall forthwith return or be returned to the custody from which he [or she] was paroled, and thereafter his [or her] case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

Regulations implementing § 1182(d)(5)(A) provide further guidance on the Secretary's decision to terminate an individual's humanitarian parole and describe two circumstances in which parole terminates: automatic termination and non-automatic termination. *See* 8 C.F.R. § 212.5(e)(2). First, if a detainee receives humanitarian parole for a specified period of time, that parole "shall be *automatically terminated without written notice . . . at the expiration of the time for which parole was authorized.*" 8 C.F.R. § 212.5(e)(1)(ii) (emphasis added).[6] At that point, "any order of exclusion, deportation, or removal previously entered shall be executed," unless "the exclusion, deportation, or removal order cannot be executed within a reasonable time," meaning "the alien shall again be released on parole unless in the opinion of [an] official listed [in 8 C.F.R. § 212.5(a)[7]] the public interest requires that the alien be continued in custody." 8 C.F.R. § 212.5(e)(2)(i).

---

[6] The implementing regulations also provide that parole "shall be automatically terminated without written notice . . . upon the departure from the United States of the alien[.]" 8 C.F.R. § 212.5(e)(1)(i). Because Mr. A did not depart from the United States after his parole into the country, the Court does not discuss this provision of the regulations.

[7] The complete list of authorized DHS individuals includes:

the Assistant Commissioner, Office of Field Operations; Director, Detention and Removal; directors of field operations; port directors; special agents in charge; deputy special agents in charge; associate special agents in charge; assistant special agents in charge; resident agents in charge; field office directors; deputy field office directors; chief patrol agents; district directors for services; and those other officials

Second, non-automatic termination pertains in cases where the noncitizen was not paroled for a fixed period of time, or that time has not yet run. In such cases, immigration officials may terminate humanitarian parole only

(1) "upon accomplishment of the purpose for which parole was authorized," *or*

(2) "when[,] in the opinion of one of the immigration officials listed in [8 C.F.R. § 212.5(a)], neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States," *and*

(3) DHS provides "*written notice* to the alien and he or she shall be restored to the status that he or she had at the time of parole."

8 C.F.R. § 212.5(e)(2)(i) (emphases added).

Finally, like parolees facing automatic termination, "any order of exclusion, deportation, or removal previously entered" against a parolee subject to non-automatic termination "shall be executed" unless the parolee's "exclusion, deportation, or removal order cannot be executed within a reasonable time." *Id.* If such is the case, "the alien shall again be released on parole unless in the opinion of the official listed [in 8 C.F.R. § 212.5(a)] the public interest requires that the alien be continued in custody." *Id.*

To summarize, where a parolee is granted humanitarian parole for a fixed period of time and that period of time runs, the noncitizen "shall be restored," without notice, "to the status that he or she had at the time of parole." 8 C.F.R. §§ 212.5(e)(1), (e)(2)(i). But where a parolee has not been paroled for a fixed period of time—or, if a parolee *was* subject to a fixed period of parole but that period of time has not run—termination of parole is appropriate only upon: (1) accomplishment of the purpose for which parole was authorized, *or* (2) the opinion of a

---

as may be designated in writing, subject to the parole and detention authority of the Secretary or his designees.

8 C.F.R. § 212.5(a).

6

qualified DHS official that neither humanitarian concerns nor public benefits warrant the continued presence of the noncitizen in the United States, *and* (3) notice to the parolee. 8 U.S.C. § 1182(a)(5)(A); 8 C.F.R. § 212.5(e)(2)(i); *see Begaliev v. Warden of Otero Cnty. Processing Cntr.*, No. 2:26-cv-00358, 2026 WL 837109, at *2–3 (D.N.M. Mar. 26, 2026) (finding that petitioner was entitled to notice that his parole would be terminated where petitioner was detained before his parole automatically terminated).

### B.    Factual Background[8]

#### 1.    Mr. A Was Persecuted in Sudan as a Member of the Zaghawa Ethnic Group

Mr. A "is an asylum seeker from Sudan." (ECF No. 14 ¶ 1.) "Mr. A was born in 1997 in a village in Darfur, Sudan as a member of the Zaghawa ethnic group, a community that has long been targeted by Sudanese government forces and affiliated militias." (ECF No. 14 ¶ 19.) Throughout Mr. A's childhood, Sudanese government forces and the Janjaweed, government-affiliated militia forces, attacked Mr. A's community and family. (ECF No. 14 ¶¶ 20–21.) The Janjaweed detained, tortured, and interrogated Mr. A on three separate occasions, including through the forceable removal of his toenails and the use of ethnic slurs against the Zaghawa people. (ECF No. 14 ¶¶ 21–24.) In 2023, "as violence against Zaghawa civilians intensified across Darfur," and following his third detention by the Janjaweed, Mr. A "concluded that remaining in Sudan placed his life at imminent risk." (ECF No. 14 ¶ 25.) "[H]e fled Sudan in search of safety." (ECF No. 14 ¶ 25.)

---

[8] The Court recites the facts as alleged by Mr. A in his Amended Petition, (ECF No. 14), and by the United States as alleged in a declaration it attached to its briefing signed by ICE Assistant Field Officer Director Charles M. Byrne, (ECF No. 25-1). Where appropriate, the Court has noted facts that the parties contest. Otherwise, the facts recited by the Court are uncontested.

### 2.   **DHS Paroles Mr. A Upon his Arrival in the United States**

Mr. A entered the United States in early July 2024.[9]  (ECF No. 14 ¶ 26; ECF No. 25-1 ¶ 6.)   Immigration officials initially detained Mr. A and served him with a Form I-860, Notice and Order of Expedited Removal pursuant to 8 U.S.C. § 1225(b)(1)(A).  (ECF No. 25-1 ¶ 7; *see also* ECF No. 14 ¶ 27.)

On August 22, 2024, the Department of Homeland Security ("DHS") released Mr. A on humanitarian parole pursuant to 8 U.S.C. § 1182(d)(5)(A).  (ECF No. 14 ¶ 28; ECF No. 14-2, at 2; ECF No. 25-1 ¶ 8.)  The Notice of Parole authorizing Mr. A's parole provided, in pertinent part:

> This letter is to inform you that U.S. Immigrations and Customs Enforcement (ICE) has decided to parole you from its custody pursuant to its authority under section 212(d)(5)(A) [8 U.S.C. § 1182(d)(5)(A)] of the Immigration and Nationality Act. This notice is being issued to you in lieu of Form I-94, *Arrival-Departure Record*, *see* 8 C.F.R. § 235.1(h)(2), and you should maintain a copy of this letter in your possession at all times.
>
> Your parole authorization is valid for one year beginning from the date on this notice and will automatically terminate upon your departure or removal from the United States or at the end of the one-year period unless ICE provides you with an extension at its discretion.  ICE may also terminate parole on notice prior to the automatic termination date.  Parole is entirely within the discretion of ICE and can be terminated at any time and for any reason.  Your parole is not valid for work authorization and is not an admission in lawful status.

(ECF No. 14-2, at 2.)  Pursuant to the Notice of Parole, Mr. A's humanitarian parole was set to terminate automatically one year from its issuance:  on August 22, 2025.  (ECF No. 14-2, at 1.)

Following his release on humanitarian parole, Mr. A moved to New York to live with his cousin.  (ECF No. 14 ¶¶ 29, 32.)  There, Mr. A joined a local mosque and enrolled in English

---

[9] Petitioner states that he arrived in the United States on July 8, 2024, (ECF No. 14 ¶ 26), while Respondents contend that "Customs and Border Patrol encountered Petitioner at or near Lukeville, Arizona" on "July 7, 2024," (ECF No. 25-1 ¶ 6).  Whether Mr. A arrived on July 7 or July 8, 2024 is immaterial to this Court's consideration of Mr. A's Amended Petition.

classes, which he attended most days of the week. (ECF No. 14 ¶ 32.) On September 13, 2024, Mr. A "filed an application for asylum based on his past persecution and fear of future harm in Sudan." (ECF No. 14 ¶ 30.)

### 3.    ICE Issues Mr. A an Order of Supervision Form

On September 10, 2024, nearly twenty days after DHS released Mr. A on humanitarian parole, ICE issued Mr. A an Order of Supervision. (ECF No. 14 ¶ 29; ECF No. 14-3, at 2.) Making no mention of Mr. A's humanitarian parole, the Order of Supervision indicated that Mr. A was subject to a final order of removal dated July 8, 2024 but provided that Mr. A would be released under several mandatory conditions, including that he report to an ICE field office in New York on March 17, 2025.[10] (ECF No. 14-2, at 2, 5.)

### 4.    Immigration Officials Detain Mr. A During His March 17, 2025 Check-in with ICE

"On March 17, 2025, [Mr. A] appeared at the New York City ICE Field Office for a routine check-in pursuant to his Order of Supervision." (ECF No. 14 ¶ 36.) Without notice that his humanitarian parole would be terminated, or that he was subject to detention on any other basis, Mr. A was detained by ICE officials around 9:30 a.m. (ECF No. 14 ¶ 37.) His humanitarian parole, which was effective until August 22, 2025, had not automatically

---

[10] It is unclear from the record whether Mr. A was actually subject to a final order of removal dated July 8, 2024. (*Compare* ECF No. 14-1 ¶ 27 (explaining that Mr. A was "issued an order of removal on July 8, 2024" when he was placed in expedited removal proceedings under § 1225(b)(1)(A)(i)) and ECF No. 25-1 ¶ 7 (same) *with* ECF No. 14-1 ¶ 38 (explaining that at the time of Mr. A's detention, "no *final* removal order had been issued against him").) The parties agree that Mr. A has since been ordered removed, (ECF No. 14 ¶ 58; ECF No. 25-1 ¶ 14), but that order of removal is not yet final, (ECF No. 28 ¶ 5).

Ultimately, whether Mr. A was subject to a final order of removal when DHS issued the Order of Supervision is not material to this Court's finding that Respondents deprived Mr. A of due process when they revoked his parole in contravention of the procedures set out in the INA and its implementing regulations.

terminated. (ECF No. 14 ¶ 37; *see* ECF No. 14-2, at 2.) At the time of his arrest, Mr. A "had not missed any reporting obligations, had not violated any conditions of supervision, and had not been charged with or convicted of any criminal offense." (ECF No. 14 ¶ 37.)

Around 11:30 a.m., *after* ICE officials arrested Mr. A, an ICE Deportation Officer served Mr. A with a Notice of Revocation of Release (the "Revocation Notice"). (ECF No. 14 ¶ 38; ECF No. 14-5, at 3.) The Revocation Notice was authorized by an "Assistant Field Office Director" and explained that Mr. A's *Order of Supervision—not* his parole—was revoked. (ECF No. 14-5, at 2.) The Revocation Notice stated, in relevant part:

> You were released on an Order of Supervision on August 21, 2024. That order is being revoked, because your case has come to a final administrative order of removal and a travel document has been procured to affect your removal from the United States. Your removal is now imminent, and you currently do not have any appeals or applications pending.
>
> Based on the above, and pursuant to 8 C.F.R. § 241.4,[11] you are to remain in ICE custody at this time.

(ECF No. 14-5, at 2.)[12]

---

[11] 8 C.F.R. § 241.4 governs custody determinations of noncitizens ordered removed and those who are inadmissible under 8 U.S.C. § 1182. 8 C.F.R. § 241.4(a)(1). It also prescribes procedures for revoking an order of release. 8 C.F.R. § 241.4(l). Relevant here, DHS may revoke an order of supervision only if an authorized DHS official determines that at least one of four predicates is satisfied: (1) the "purposes of release have been served"; (2) the noncitizen "violates any condition of release"; (3) revocation "is appropriate to enforce a removal order or to commence removal proceedings against" a noncitizen"; or (4) the "conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate." § 241.4(l)(2)(i)–(iv).

If DHS determines that one of the four predicates is satisfied, the noncitizen "will be notified of the reasons for the revocation of his or her release or parole" and "will be afforded an initial informal interview promptly after his or her return to [DHS] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." § 241.4(l)(1); *Santamaria Orellana v. Baker*, No. 25-cv-1788, 2025 WL 2841886, at *5 (D. Md. Oct. 7, 2025).

[12] As Petitioner notes, the Revocation Notice included at least material three errors. (ECF No. 14 ¶¶ 38, 85.) First, Mr. A was not released on an Order of Supervision on August 21, 2024. Instead, Petitioner was paroled on August 22, 2024, (ECF No. 14-2, at 2), and received the Order

An ICE officer subsequently interviewed Petitioner "in order to afford [Petitioner] an opportunity to respond to the reasons for revocation of his . . . [O]rder of [S]upervision." (ECF No. 14-5, at 4).  At 12:19 p.m., DHS served Mr. A with a Notice of Custody Determination, which indicated that DHS was detaining Mr. A pursuant to 8 U.S.C. § 1226.  (ECF No. 14 ¶ 41; ECF No. 14-6, at 2.)

### 5.    An Immigration Judge Orders Mr. A Removed to Sudan But Grants him Withholding of Removal

On July 17, 2025, Mr. A requested "a credible fear interview concerning his fear of persecution in Sudan." (ECF No. 14 ¶ 45; ECF No. 25-1 ¶ 11.)  On August 11, 2025, DHS conducted a credible fear interview, after which "DHS determined that Mr. A had a reasonable fear of persecution if removed to Sudan based on the persecution Mr. A experienced as a member of the Zaghawa tribe throughout his life." (ECF No. 14 ¶¶ 47–48; ECF No. 25-1 ¶ 12.)

---

of Supervision on September 10, 2024, (ECF No. 14-3, at 2).  Second, contrary to the Revocation Notice's statement that Mr. A "[did] not have any appeals or applications pending," Mr. A had a pending asylum application when he reported to ICE on March 17, 2025.  (ECF No. 14 ¶¶ 30, 38.)  And third, Mr. A's case had not "come to a final administrative order of removal." (ECF No. 14 ¶ 38.)

In fact, ICE's own records from the day Mr. A was detained—and the date DHS issued the Revocation Notice—contain conflicting information highlighting these mistakes.  For example, information logged by an ICE official documenting Mr. A's March 17, 2025 "encounter" state that Mr. A "has a pending Global Affirm Asylum application with [United States Customs and Immigration Services]." (ECF No. 14-4, at 1–2.)  The same document indicates that Mr. A was *not* subject to a final order of removal.  (ECF No. 14-4, at 2 (categorizing Petitioner as "Final Order of Removal:  No").)

In addition, a Notice of Custody Determination served on Mr. A by ICE less than one hour after DHS issued the Revocation Notice stated that DHS was detaining Mr. A "[p]ursuant to the authority contained in [8 U.S.C. § 1226] . . . *pending a final administrative determination in [his] case*." (ECF No. 14-6, at 2.)  Thus, contrary to the Revocation Notice, the Notice of Custody Determination indicated that Mr. A was not already subject to a final administrative decision.

11

On August 28, 2025, DHS issued a Notice to Appear ("NTA")[13] to Mr. A, which directed him to appear at a master calendar hearing and to file an amended asylum application. (ECF No. 14 ¶ 49.) Mr. A timely amended his asylum application and attended the master calendar hearing, during which the Immigration Judge set Mr. A's individual hearing for November 25, 2025.[14] (ECF No. 14 ¶ 51.)

On January 16, 2026, DHS moved to pretermit Mr. A's asylum application "based on its Asylum Cooperative Agreement (ACA) with Uganda." (ECF No. 14 ¶ 54.) DHS stated that it intended to remove Mr. A to Uganda. (ECF No. 14 ¶ 54.) Mr. A opposed DHS' motion to pretermit, explaining that he would face persecution if removed to Uganda. (ECF No. 14 ¶ 55.) DHS subsequently withdrew its motion to pretermit, and the Immigration Court rescheduled Mr. A's individual hearing for April 17, 2026. (ECF No. 14 ¶ 56.)

On April 17, 2026, the Immigration Court held an individual hearing on Mr. A's claims for asylum and withholding of removal. (ECF No. 14 ¶ 57.) The Immigration Judge denied Mr. A's claim for asylum because Petitioner "had not entered the United States at a legal border crossing point" but granted Mr. A's claim for withholding of removal under the INA, finding it more likely than not that Mr. A would be persecuted based on his Zaghawa ethnicity if he were

---

[13] A Notice to Appear is a "'[c]harging document' that 'initiates a proceeding before an Immigration Judge.'" *Hasan v. Crawford*, 800 F. Supp. 3d 641, 647 n.3 (E.D. Va. 2025) (quoting 8 C.F.R. § 1003.13).

[14] Although not material to the resolution of the instant Amended Petition, the Amended Petition states that Mr. A's counsel observed "indicia that Mr. A was unable to assist in his defense" while preparing for his individual hearing. (ECF No. 14 ¶ 52.) Counsel retained an expert to perform a competency and psychological evaluation, who determined that Mr. A suffered from Post Traumatic Stress Disorder ("PTSD") and panic attacks, which "compromised Mr. A's ability to assist in his defense" and rendered him "incompetent to proceed with his individual hearing." (ECF No. 14 ¶ 52.) Mr. A's counsel subsequently "filed a motion for competency safeguards" with the Immigration Court. (ECF No. 14 ¶ 53.)

removed to Sudan. (ECF No. 14 ¶¶ 57–58.) Mr. A appealed the Immigration Judge's denial of asylum, and that appeal remains pending. (*See* ECF No. 28 ¶ 5; EOIR, Automated Case Information, https://acis.eoir.justice.gov/en/caseInformation (last visited June 1, 2026).) DHS waived appeal of the Immigration Judge's grant of withholding of removal. (ECF No. 14 ¶ 58.)

"Mr. A has continuously remained in ICE custody since March 17, 2025." (ECF No. 14 ¶ 42.) He is currently detained at the Farmville Detention Center in Farmville, Virginia. (ECF No. 14 ¶ 42.) If released, Mr. A will return to living with his cousin, who now lives in Illinois, where the cousin is steadily employed. (ECF No. 14 ¶ 61.)

## C.    **Procedural Background**

On April 13, 2026, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, (ECF No. 1), a motion to proceed under pseudonym, (ECF No. 2), and a motion to seal, (ECF No. 3). On April 16, 2026, the Court ordered Petitioner to file an amended petition that complied with Rule 2 of the Rules Governing Section 2254 cases[15] and denied without prejudice Mr. A's motion to proceed under pseudonym and motion to seal. (ECF No. 10.) On April 21, 2026, Petitioner filed the instant Amended Petition, which complies with Rule 2. (ECF No. 14.) Petitioner also filed a renewed Motion to Proceed Under Pseudoym, (ECF Nos. 19, 20), and a renewed Motion to Seal, (ECF Nos. 21, 22).

On April 24, 2026, the Court ordered Respondents to file a response to the Amended Petition and each of Mr. A's motions within five days. (ECF No. 24.) The Court further ordered that any replies by Petitioner would be due three days after the filing of Respondents' response. (ECF No. 24.) On April 29, 2026, Respondents filed an Opposition to the Amended Petition,

---

[15] Rule 1(b) of the Rules Governing § 2254 cases permits this Court to apply the Rules Governing § 2254 Cases to petitions under 28 U.S.C. § 2241. Rule 1(b), Rules Governing § 2254 Cases; *see Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C. Cir. 2007).

(ECF No. 25), as well as responses to each of Mr. A's motions, (ECF Nos. 26, 27). On May 4, 2026, Petitioner filed a reply in support of the Amended Petition, (ECF No. 28), and an accompanying Motion to Seal seeking to seal Exhibit G to the reply, (ECF Nos. 29, 30).

## II. Analysis

### A.    The Court Will Grant Mr. A's Amended Petition Because His Due Process Rights Have Been Violated

#### 1.    Standard of Review

28 U.S.C. § 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." *Id.* "A federal court may grant habeas relief only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States." *Torrence v. Lewis*, 60 F.4th 209, 213 (4th Cir. 2023) (internal citations and brackets omitted). After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

#### 2.    The Court Will Grant the Amended Petition

Mr. A argues that Respondents violated his due process rights under the Fifth Amendment by (1) terminating his humanitarian parole in contravention of 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5 (Count I); (2) revoking his Order of Supervision without complying with the procedures set out in 8 C.F.R. § 241.4(l) (Count II); and, (3) detaining Petitioner for a prolonged period of time (Count III). (ECF No. 14 ¶¶ 108–123.)

Respondents contend that this Court lacks jurisdiction to consider Mr. A's Amended Petition, and that even if this Court finds that it has jurisdiction to consider the Amended Petition, Mr. A received all of the process he was due under the INA. (ECF No. 25, at 5, 10–14.)

14

The Court will grant the Amended Petition as to Count I. The Court has jurisdiction over Mr. A's Amended Petition. Also, Respondents failed to provide Petitioner with the process due under § 1182(d)(5)(A) and its implementing regulations when they revoked Petitioner's humanitarian parole. Because the Court concludes that Mr. A's due process rights have been violated under Count I, the Court does not reach Mr. A's due process arguments in Counts II and III. The Court will order Respondents to release Mr. A.

### a. The Court Has Jurisdiction to Consider Mr. A's Amended Petition

Respondents argue that this Court lacks jurisdiction to consider Mr. A's habeas petition for two reasons. First, Respondents contend that the Court lacks jurisdiction under 8 U.S.C. § 1252(a)(2)(B)(ii), which limits federal courts' jurisdiction to review actions by the Attorney General or the Secretary of Homeland Security taken in his or her discretion. Second, Respondents contend that this Court lacks jurisdiction in *habeas* to consider Mr. A's challenges regarding the revocation of his humanitarian parole in the Amended Petition because Mr. A is properly detained under § 1225, meaning "parole has nothing to do with Petitioner's current detention." (ECF No. 25, at 7.)

### i. 8 U.S.C. § 1252(a)(2)(B)(ii) Does Not Strip this Court of Jurisdiction to Consider Mr. A's Amended Petition

8 U.S.C. § 1252(a)(2)(B)(ii) strips federal courts of jurisdiction to consider any "decision or action of the Attorney General or the Secretary of Homeland Security" committed to their discretion. But § 1252(a)(2)(B)(ii) "does not bar review of *all* discretionary decisions; rather, it 'applies only to acts over which a statute gives [DHS] pure discretion unguided by legal standards or statutory guidelines.'" *Pineda-Berrios*, 2026 WL 384159, at *4 (emphasis added) (quoting *Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004)).

As courts in this district and across the country have correctly explained, § 1252(a)(2)(B)(ii) does not strip federal courts of jurisdiction to consider the revocation of humanitarian parole "because DHS' authority to revoke parole is not *purely* discretionary." *Pineda-Berrios*, 2026 WL 384159, at *4 (emphasis added). "DHS certainly has some discretion to revoke parole." *Id.* Indeed, 8 U.S.C. § 1182(d)(5)(A) provides that, once humanitarian parole has been granted, DHS may only terminate parole when, "*in the opinion* of the Secretary of Homeland Security," the "purposes of such parole . . . have been served." § 1182(d)(5)(A) (emphasis added); *see also Y-Z-L-H v. Bostock*, 792 F. Supp. 3d 1123, 1137 (D. Or. 2025). But that discretion is cabined by mandatory requirements: DHS is required to consider, "on a case-by-case basis[,] whether the purposes of parole have been accomplished and whether 'neither humanitarian reasons nor public benefit warrants the continued presence of the alien in the United States.'" *Pineda-Berrios*, 2026 WL 384159, at *4 (quoting 8 C.F.R. § 212.5(e)). Because DHS must comply with specific statutory and regulatory requirements before revoking parole, such a decision is "not within the discretion granted by § 1182(d)(5)(A) for DHS to refuse to comply." *Id.* (internal quotations and brackets omitted). Accordingly, § 1252(a)(2)(B)(ii) does not strip this Court of jurisdiction to consider Mr. A's Amended Petition. *Gabriel v. Bondi*, No. 25-cv-4298, 2025 WL 3443584, at *5 (D. Minn. Dec. 1, 2025) ("Whether Respondents complied with mandatory procedures in exercising their discretionary power is not precluded from review by § 1252(a)(2)(B)(ii)."); *Bostock*, 792 F. Supp. 3d at 1138 (same); *see also L.M. v. Noem*, No. 2:25-cv-02194, 2026 WL 103231, at *8–9 (D. Nev. Jan. 14, 2026) (same); *Francois v. Hale*, No. 2:26-cv-13, 2026 WL 472845, at *4 (D. Vt. Feb. 19, 2026) (collecting cases and holding the same).

16

**ii.    Mr. A's Due Process Challenges to DHS' Revocation of His Humanitarian Parole are Properly Raised in Habeas**

Respondents next argue that because Mr. A is "appropriately" detained under the mandatory detention provisions of § 1225, Petitioner's challenge to the revocation of his humanitarian parole cannot be considered through a habeas petition. In other words, Respondents contend that because the "the purpose of a habeas petition is to challenge a detainee's current detention," and because Mr. A is validly detained under § 1225, the revocation of his parole "has nothing to do with Petitioner's current detention."[16] (ECF No. 25, at 7.) The Court concludes otherwise.

As set out above, Congress expressly limited DHS' authority to retake custody of a humanitarian parolee in § 1182(d)(5)(A). While Respondents could have—and did—detain Mr. A under § 1225 upon his arrival at the border, DHS' grant of humanitarian parole changed Petitioner's classification from one as a noncitizen detained under § 1225 to that of a parolee under § 1182(d)(5)(A). Unless and until DHS satisfied the requirements in § 1182(d)(5)(A) and its implementing regulations to revoke or terminate that parole, DHS "did not have the authority to arrest and detain" Petitioner. *Altamura v. Unknown Party #1*, No. 1:26-cv-1197, 2026 WL

---

[16] Petitioner argues that he is detained under § 1226(a)'s discretionary detention provisions rather than § 1225's mandatory detention provisions. (ECF No. 14 ¶ 90.) And despite Respondents' argument that Mr. A is detained under § 1225, at least one document prepared by ICE and served on Petitioner states that he is detained pursuant to § 1226, not § 1225. (*See* ECF No. 14 ¶ 90 (citing ECF No. 14-6, at 2 (notice of custody determination providing that Petitioner is detained "[p]ursuant to the authority contained in section 236 of the Immigration and Nationality Act," codified at 8 U.S.C. § 1226)).)

Regardless of which statutory provision governs Mr. A's detention, Respondents have, as the Court explains *infra*, failed to provide Petitioner with the process due under § 1182(d)(5)(A) and its implementing regulations. *Seleznev v. Mullin*, No. 3:26-cv-130 (MHL), 2026 WL 907692, at *5 (E.D. Va. Mar. 31, 2026).

17

1141150, at *4 (W.D. Mich. Apr. 28, 2026); *Mata Velasquez v. Kurzdorfer*, 794 F. Supp. 3d 128, 145 (W.D.N.Y. 2025) ("The government . . . does not have the authority to arrest a noncitizen who has been granted parole without properly terminating that parole."). Put differently, rearresting Mr. A without following the procedures in 8 U.S.C. § 1182(d)(5)(A) and 8 C.F.R. § 212.5 did not automatically change Petitioner's classification from a parolee under § 1182(d)(5)(A) to a detainee under § 1225.

Indeed, courts within the Fourth Circuit and around the country have repeatedly held that "courts can review whether DHS complied with the requirements of the governing parole statute and regulation" in a habeas action where the challenger is in custody. *Darwich v. Kemerling*, 1:25-cv-1162, 2026 WL 170801, at *5 (M.D.N.C. Jan. 22, 2026); *see also Pineda-Berrios*, 2026 WL 384159, at *5–8 (evaluating the propriety of the revocation of petitioner's parole and subsequent detention on a § 2241 petition); *Araujo v. LaRose*, No. 25-cv-2942, 2025 WL 3278016, at *1 (S.D. Cal. Nov. 24, 2025) (considering petitioner's challenge to improper revocation of his parole through a habeas petition). This Court joins them.

The Court turns to the merit of Mr. A's Amended Petition.

### b.      <u>Respondents Violated Mr. A's Due Process Rights</u>

Employing the framework established in *Mathews v. Eldridge*, 424 U.S. 319 (1976), Mr. A argues that Respondents violated his due process rights by revoking his humanitarian parole "months before the scheduled expiration of his parole," and "without notice, explanation, or opportunity to respond." (ECF No. 14 ¶¶ 66–79, 108–116.)

Respondents counter that Mr. A's "due process rights . . . are limited to what applicable statutes provide," and that even if the Court determines that Mr. A's due process rights extend beyond the INA, those rights have not been violated. (ECF No. 25, at 3, 10–15.)

18

Even assuming that Mr. A's due process rights are defined by the INA alone, Respondents have failed to provide Petitioner with the process he is due under § 1182(d)(5)(A) and its implementing regulations. Petitioner's detention despite his valid grant of humanitarian parole therefore violates his due process rights.[17]

> **i.    Respondents Have Not Provided Mr. A with the Process Due Under § 1182(d)(5)(A) and its Implementing Regulations**

Before determining whether Mr. A's due process rights were violated, the Court must determine the process owed to Mr. A under § 1182(d)(5)(A). As described above, § 1182(d)(5)(A)'s implementing regulations identify two paths through which DHS may revoke a grant of humanitarian parole, and each entitles the parolee to different amounts of process.

In this case, although Mr. A was paroled for a fixed term, ICE detained Mr. A five months before his parole was set to expire. (ECF No. 14 ¶ 37; *see* ECF No. 14-2, at 2.) Accordingly, Respondents were required to follow the procedures outlined in 8 C.F.R. § 212.5(e)(2)(i) before detaining Mr. A. Under § 212.5(e)(2)(i), ICE could only revoke Mr. A's parole following a determination that (1) Petitioner had "accomplish[ed] . . . the purpose for which parole was authorized" *or* (2) neither humanitarian reasons nor public benefit warranted Mr. A's continued presence in the Untied States, *and* (3) upon notice. 8 C.F.R. § 212.5(e)(2)(i). *See Rassul v. Field Officer Director*, No. 25-cv-232, 2026 WL 834737, at *4 (E.D. Ky. Mar. 26, 2026) ("[T]he [c]ourt finds that neither requirement for automatic termination of parole had occurred at the time [petitioner] was detained. . . . [Petitioner] had nearly eleven months before

---

[17] The Court's focus on Mr. A's statutory due process rights should not be construed as an endorsement by this Court that Mr. A was not entitled to additional due process under the Fifth Amendment. Indeed, this Court, and others in this District, have determined as much in similar cases. *See, e.g., Seleznev*, 2026 WL 907692, at *5; *Pineda-Berrios*, 2026 WL 384159, at *5–7.

his parole at the time he was arrested by ICE.  Because [petitioner's] parole d[id] not automatically terminate, [r]espondents need to show they provided [petitioner] written notice of the termination of his parole.").  As the Court explains below, Respondents failed to satisfy all three of these requirements.

First, the record is bereft of any evidence that Respondents considered whether the purposes of Mr. A's parole had been served before they detained him, nor did an authorized official determine that Mr. A's presence was not warranted in the United States for humanitarian reasons or for the public benefit.  The record before the Court plainly shows that none of the documentation Mr. A was provided prior to, during, or following his arrest make any mention of parole.  (*See* ECF Nos. 14-4—14-7.)  Tellingly, Respondents make no argument to the contrary.  "As district courts all over the country have held, the parole termination statute and regulation require DHS to make 'an individualized review' that the purposes of a particular noncitizen's parole have been met or that the statutorily-provided reasons for parole no longer exist."  *Darwich*, 2026 WL 170801, at *7 (citation omitted); *see Y-Z-L-H*, 792 F. Supp. 3d at 1144–45.  Where, as here, DHS fails to make that individualized determination, the noncitizen's due process rights have been violated.[18]

Respondents also failed to provide Mr. A with written notice before terminating his humanitarian parole.  Section 212.5(e)(2)(i) does not define what constitutes "written notice," but it provides that "[w]hen a charging document is served on the alien, the charging document will constitute written notice of termination of parole, unless otherwise specified."  *Id.*  The INA

---

[18] Respondents submit that Petitioner was released on parole "based on no significant likelihood of reasonable removab[ility] in the foreseeable future due to the civil unrest in Sudan." (ECF No. 25-1 ¶ 8.)  Mr. A contends that he was paroled "to pursue his asylum claim." (ECF No. 14 ¶ 28.)  Regardless of *why* Mr. A was paroled, Respondents failed to make a particularized determination that *any* purpose had been served.

defines a "charging document" to mean a "written instrument that initiates a proceeding before an immigration judge," including "a Notice to Appear, a Notice of Referral to Immigration Judge, and a Notice of Intention to Rescind and Request for Hearing by Alien." 8 C.F.R. § 244.1.

Here, the record includes only one written communication from ICE to Mr. A between the time that Mr. A was paroled and the time of his arrest: the Order of Supervision. But the Order of Supervision indicated only that Mr. A report in person to a particular ICE office on March 17, 2025. (ECF No. 14-2, at 2.) It made no mention of Mr. A's possible arrest, nor did it make any mention of his parole. Respondents do not contend that it amounted to written notice.

The record does indicate that ICE served Mr. A with three documents when he reported on March 17, 2025: the Revocation Notice, a Notice of Custody Determination, and an Arrest Warrant. (ECF Nos. 14-5—14-6.) For two reasons, all three of these documents likewise fail to satisfy 8 C.F.R. § 212.5(e)(2)(i)'s notice requirement. First, none make any reference to Mr. A's parole. This failure alone could compel the Court to find that they do not satisfy the notice requirement. *See L.M.G. v. Almodovar*, No. 26-cv-00890, 2026 WL 483183, at *3 (S.D.N.Y. Feb. 20, 2026) ("At the time Petitioner was arrested, the only document besides the arrest warrant that the Government served on him was a 'Notice of Custody Determination.' That notice made no mention of Petitioner's parole status. And no other document or other evidence in the record reflects that Petitioner was provided any notice that his parole was terminated before or at the time of his arrest.") (citation and emphasis omitted); *Rassul*, 2026 WL 834737, at *5 (finding that an arrest warrant did not put petitioner on notice that his parole would be terminated because the warrant did not mention the petitioner's parole status at all, and did "not include language that explicitly state[d] that his parole status was being terminated" and "no

language [on the face of the warrant] that would indicate" as much). Second, each document was issued *after* Mr. A's arrest. Thus, even to the extent that these documents could have served as notice of revocation of parole, the fact that they were served *after* Mr. A's arrest means that they could not have operated as notice that his humanitarian parole would be terminated *in advance* of his arrest. *See L.M.G.*, 2026 WL 483183, at *3 n.4 ("Petitioner was ultimately served with a Notice to Appear. However, the Notice to Appear was not served on Petitioner until June 25, 2025—six days after his arrest and detention. This document cannot have provided Petitioner sufficient (or any) notice of the revocation of his parole in advance of his arrest.") (internal citations omitted). As with the Order of Supervision, Respondents do not argue that these documents satisfied § 212.5(e)(2)(i)'s written notice requirement, nor do they point to any other document that might have. [19]

At bottom, absent evidence or argument from Respondents that DHS conducted an individualized determination that Mr. A had either accomplished the purpose for which his humanitarian parole was authorized or that Mr. A's continued presence in the United States was no longer warranted, and because Respondents failed to provide Mr. A written notice before

---

[19] Respondents do argue that "Petitioner received notice of his revocation of release." (ECF No. 25, at 7 (citing ECF No. 25-1 ¶ 10).) But this argument is raised in opposition to Mr. A's claim that ICE improperly revoked his Order of Supervision, which is independent from his claim that revocation of his *parole* violated due process. (*Compare* ECF No. 14 ¶¶ 108–111 (asserting that Petitioner's revocation of his parole violated due process) *with* ECF No. 14 ¶¶ 112–116 (asserting that Petitioner's revocation of the Order of Supervision violated due process).)

In any event, the only "evidence" that Respondents offer that Mr. A had notice of his revocation of release is a line from Respondents' declaration, which states: "On March 17, 2025, Petitioner reported for his scheduled check in and was taken into civil immigration custody." (ECF No. 25-1 ¶ 10.) That Mr. A appeared for his scheduled "check in" falls far short of establishing that Mr. A had notice that his Order of Supervision would be revoked, nor does it serve as notice that his parole would be terminated.

22

terminating his parole, the record firmly establishes that Mr. A's arrest and detention violated his due process rights.[20]

> ### c.  The Appropriate Remedy for the Violation of Mr. A's Due Process Rights is Immediate Release

Because Respondents violated Petitioner's due process rights, the Court must determine the appropriate remedy for that violation.  Respondents revoked Mr. A's humanitarian parole before its term expired, without any notice, and without any determination as to whether its purposes had been served.  The only remedy for that violation of his due process rights is release.  The Court will order Respondents to release Mr. A immediately.  *See Darwich*, 2026 WL 170801, at *8 (finding release to be the proper remedy where the parolee was detained without explanation); *Seleznev*, 2026 WL 907692, at *7 (same).

For the reasons articulated above, Respondents' revocation of Mr. A's humanitarian parole violated his due process rights under the INA and its implementing regulations.  The Court will grant Mr. A's Amended Petition, (ECF No. 14), and order that Respondents immediately release Petitioner.

---

[20] Respondents also argue that "there is no due process violation as to the termination of Petitioner's parole" because "[p]arole is a discretionary benefit, and the Fourth Circuit has made clear that noncitizens have no property or liberty interest in discretionary benefits." (ECF No. 25, at 7 (citing *Dekoladenu v. Gonzalez*, 459 F.3d 500, 508 (4th Cir. 2006)).)

As Petitioner correctly argues in Response, that parole is a discretionary benefit "misses the point." (ECF No. 28, at 7.)  Petitioner was *granted* parole.  Once awarded that discretionary benefit, he was entitled to the process provided by the INA before Respondents revoked it. *See, e.g., Gabriel*, 2025 WL 3443584, at *4–5, ("Whether Respondents complied with mandatory procedures in exercising their discretionary power is not precluded from review by § 1252(a)(2)(B)(ii).").

**B.    Mr. A's Motion to Proceed Under Pseudonym**

Petitioner also moves this Court for leave to proceed under the pseudonym "A.A." (ECF No. 19.) Respondents take no position on Mr. A's request. (ECF No. 26.)

There is a "general presumption" in favor of open judicial proceedings. However, under certain "exceptional circumstances," a court may allow a party to proceed pseudonymously. *Doe v. Pub. Citizen*, 749 F.3d 246, 273–74 (4th Cir. 2014). In considering a request to proceed pseudonymously, the "district court has an independent obligation to ensure that extraordinary circumstances support such a request by balancing the party's stated interest in anonymity against the public's interest in openness and any prejudice that anonymity would pose to the opposing party." *Id.* at 274. The Fourth Circuit has established five non-exhaustive factors for courts to evaluate in considering a request to proceed by pseudonym:

(1) "Whether the justification asserted by the requesting party is merely to avoid the annoyance and criticism that may attend any litigation or is to preserve privacy in a matter of sensitive and highly personal nature";

(2) "whether identification poses a risk of retaliatory physical or mental harm to the requesting party or even more critically, to innocent nonparties";

(3) "the ages of the persons whose privacy interests are sought to be protected";

(4) "whether the action is against a governmental or private party"; and,

(5) "relatedly, the risk of unfairness to the opposing party from allowing an action against it to proceed anonymously."

*Doe v. Doe*, 85 F.4th 206, 211 (4th Cir. 2023) (internal brackets omitted) (quoting *James v. Jacobson*, 6 F.3d 233, 238 (4th Cir. 1993)).

Here, four of the five factors weigh in favor of allowing Mr. A to proceed under a pseudonym. As to the first factor, no indication exists that Mr. A's request is an attempt to avoid the "annoyance and criticism" that may attend litigation. To the contrary, the Amended Petition

24

includes details about Mr. A's persecution and torture in Darfur, disclosure of which could place Petitioner and his family at risk. The Immigration Court recognized this legitimate threat to Mr. A's safety when it granted his application for withholding of removal to Sudan based on Petitioner's showing that it was more likely than not that he would be persecuted if he were returned to Sudan. (ECF No. 14 ¶ 57.) Mr. A has demonstrated that his request to proceed by pseudonym is motivated by a genuine fear for his safety and that of his family. Thus, the first factor counsels in favor of allowing Mr. A to proceed via pseudonym. *See E.J.G. v. Perry*, No. 1:26-cv-179 (LRV), ECF No. 16, at 2 (E.D. Va. Feb. 24, 2026) (finding that petitioner's safety concerns and the Immigration Court's grant of withholding of removal to his home country based on those concerns counseled in favor of petitioner's request to proceed under a pseudonym under the first factor); *M.A. v. U.S. Citizenship & Immig. Servs.*, 1:24-cv-02040, 2024 WL 3757873, at *2 (D. Md. Aug. 12, 2024) ("[A] plaintiff's vulnerable immigration status may be properly considered a matter of sensitive and highly personal nature warranting the use of a pseudonym.") (quotation omitted).

With respect to the second factor, the risk of retaliatory physical or mental harm, Mr. A argues that "identification poses a significant risk of retaliatory harm to Mr. A" and to "his friends and family in Sudan." (ECF No. 20, at 5.) He further explains that "[i]f his identity is publicly revealed, nothing would prevent Sudanese government forces or government-affiliated militias from using that information to identify and target Mr. A's innocent associates in Sudan[.]" (ECF No. 20, at 5.) Given Mr. A's history of torture and persecution in Sudan, the Court agrees that identification plainly poses a risk of retaliatory physical or mental harm to Petitioner, or to his friends and family who remain in Sudan. This factor weighs in Mr. A's favor. *See E.J.G.*, No. 1:26-cv-179, ECF No. 16, at 3 (finding factor two weighed in petitioner's

25

favor where he established that identification could pose a risk of retaliation against himself and his family).

As to the third factor, the ages of the persons whose privacy interests the movant seeks to protect, Mr. A argues that although he is "now an adult, he is pursuing pseudonymity in significant part based on repeated ethnic persecution and torture that he endured as a minor." (ECF No. 20, at 6.)  While Petitioner directs the Court to one case that found this factor weighed in favor of pseudonymity when the party was a minor at the time relevant to the alleged abuse, that case involved sensitive medical information and educational records—materials that might be sealed regardless of whether the party was a minor.  *See Doe v. Bd. of Educ. of Anne Arundel Cnty.*, 1:25-cv-01703, 2025 WL 1865786, at *2 (D. Md. July 7, 2025).  Because Mr. A is not a minor, the Court finds that this factor weighs against allowing Petitioner to proceed by pseudonym, but only slightly.  *See E.J.G.*, No. 1:26-cv-179 (LRV), ECF No. 16, at 3 ("As for the third [] factor, the age of the movant, Petitioner is an adult, which weighs slightly against granting Petitioner's requested relief.") (internal citation omitted).

The fourth factor, whether the action is against a governmental party, balances in favor of Petitioner.  Here, Mr. A names as Respondents four governmental officials, all of whom he sues in their official capacities.  As courts have observed, the "rationale underlying this factor is that a case against a government does no harm to its reputation." *Doe v. Mast*, 745 F. Supp. 3d 399, 412 (W.D. Va. 2024) (citation omitted).  Thus, "when a litigant only sues a governmental party, courts have generally been more likely to allow a plaintiff leave to proceed under a pseudonym." *Id.*  Because Mr. A sues only governmental officials for actions taken in their official capacities, the fourth factor weighs in Petitioner's favor.

Finally, the fifth factor, risk of unfairness to the opposing party, likewise weighs in

26

Petitioner's favor.   Respondents know Mr. A's identity, (*see* ECF No. 20, at 7), and took no position on Petitioner's request, (ECF No. 26, at 1).  *See E.J.G.*, No. 1:26-cv-179 (LRV), ECF No. 16, at 4 (finding the fifth factor weighed in favor of allowing petitioner to proceed pseudonymously where petitioner was ordered to reveal his identity to respondents).

Four of the five factors weigh in Mr. A's favor, and the remaining factor weighs only slightly against it.  Accordingly, the Court concludes that Mr. A has demonstrated exceptional circumstances that allow him to proceed under a pseudonym in this action.  *See E.J.G.*, No. 1:26-cv-179 (LRV), ECF No. 16, at 4 (allowing asylum seeker to proceed under a pseudonym in a § 2241 habeas action filed in federal court).  The Court will grant Mr. A's request to proceed pseudonymously.  (ECF No. 19.)

### C.    Mr. A's Motions to Seal

Finally, Mr. A seeks leave to file under seal (1) the unredacted exhibits accompanying the original petition, (ECF Nos. 5, 5-1, 5-2, 5-3, 5-4, 5-5);[21] (2) the unredacted Amended Petition and exhibits accompanying the Amended Petition, (ECF Nos. 18, 18-1, 18-2, 18-3, 18-4, 18-5, 18-6); and, (3) the unredacted exhibit accompanying Mr. A's Reply, (ECF No. 32).  (ECF Nos. 21, 22, 29, 30.)

Respondents take no position on Mr. A's requests to seal.  (ECF No. 27, at 1.)  For the reasons articulated below, the Court will grant Mr. A's Motions to Seal.  (ECF Nos. 21, 29.)

### 1.    Standard of Review

"The right of public access to documents or materials filed in a district court derives from two independent sources:  the common law and the First Amendment."  *Va. Dep't of State Police*

---

[21] Mr. A also "moves the Court to file and maintain under seal . . . his original petition." (ECF No. 21, at 1; ECF No. 22, at 1 n1.)  The Court cannot locate an unredacted copy of the original petition on the docket, so the Court will deny this request.

*v. Washington Post*, 386 F.3d 567, 575 (4th Cir. 2004) (citation omitted). "The First Amendment right of access applies only to certain documents, such as those filed with a summary judgment motion, that 'serve[] as a substitute for trial.'" *DSS A.S. v. Pacem Defense LLC*, No. 1:24-cv-1331 (LRV), 2025 WL 908040, at *1 (E.D. Va. Jan. 28, 2025) (quoting *Va. Dep't of State Police*, 386 F.3d at 376); *see Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 252 (4th Cir. 1988) (holding that requests to seal exhibits attached to a dispositive motion, such as a motion for summary judgment, are subject to the First Amendment). "The common law right of access is broader and presumes a right of access to all judicial records and documents." *Id.*

"The distinction between the rights of access afforded by the common law and the First Amendment is significant because the common law does not afford as much substantive protection to the interests of the press and the public as does the First Amendment. Consequently, the common law does not provide as much access to the press and public as does the First Amendment." *Va. Dep't of State Police*, 386 F.3d at 575 (internal citations omitted). When the First Amendment provides a right of access, "a district court may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Id.* (quotation omitted). Under the common law, a court "may seal documents if the public's right of access is outweighed by competing interests." *In re Knight Publ'g Co.*, 743 F.2d 231, 235 (4th Cir. 1984).

"[A] court presented with a sealing request must first "determine the source of the right of access with respect to each document, because only then can it accurately weigh the competing interests at stake.'" *United States v. Doe*, 962 F.3d 139, 145–46 (4th Cir. 2020) (quoting *Va. Dep't of State Police*, 386 F.3d at 576). Regardless of the source of the public's

28

right of access to a particular document, if the Court decides to seal that document, sealing must comply with certain procedural requirements. Prior to sealing a document, the Court must

> (1) provide public notice of the request to seal and allow interested parties a reasonable opportunity to object, (2) consider less drastic alternatives to sealing the documents, and (3) provide specific reasons and factual findings supporting its decision to seal the documents and for rejecting alternatives.

*Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000) (citation omitted).

### 2.    The Court Will Grant Petitioner's Requests to Seal

The common law applies to the documents Petitioner seeks to seal. While the Court is not aware of any Fourth Circuit precedent discussing whether habeas petitions and their accompanying exhibits are subject to common law or First Amendment protections, Mr. A moves to seal the original petition, the Amended Petition, and several exhibits attached thereto and to his reply. Because these documents cannot "reasonably be considered to serve as a substitute for trial," the common law standard governs the documents for sealing. *DSS A.S.*, 2025 WL 908040, at *1. Accordingly, the motions to seal should be granted if Petitioner can show a countervailing interest that outweighs the public interest in access to the information and Petitioner has complied with the procedural requirements for sealing. *In re Knight Publ'g Co.* 743 F.2d at 235; *Ashcraft*, 218 F.3d at 302. Petitioner has satisfied those requirements.

Mr. A argues that he has a strong interest in the redacted information that outweighs the public interest in access to that information. (ECF No. 22, at 6.) The Court agrees. Mr. A seeks to seal only personally identifiable information, such as his name and signature, dissemination of which could pose serious risk of harm to Petitioner and his friends and family. Mr. A's safety, and that of his friends and family, weighs heavily in favor of sealing. *United States v. Harris*, 890 F.3d 480, 492 (4th Cir. 2018) ("Courts have recognized that an interest in protecting the

29

physical and psychological well-being of individuals related to the litigation, including family members and particularly minors, may justify restricting access.").

Mr. A's interest in protecting his personally identifiable information is not outweighed by the public's interest in access to that information. As Petitioner explains, because he seeks to seal only his personal information, the redactions "bear no effect on the public's ability to comprehend the legal implications of Mr. A's case." (ECF No. 22, at 6.) Accordingly, Mr. A's strong interest in his safety, as well as that of his family, is not outweighed by the public interest in his personal information.[22]

Mr. A also complied with the procedural requirements for sealing. First, Mr. A filed two sealing Notices in compliance with Eastern District of Virginia Local Rule 5(C)[23] notifying the public of the request to seal and allowing interested parties an opportunity to object. (ECF Nos.

---

[22] In the alternative, were the Court to apply the First Amendment standard for public access to judicial records, it would grant these sealing requests. When the First Amendment provides a right of access, "a district court may restrict access only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." *Va. Dep't of State Police*, 386 F.3d at 575 (quotation omitted). Mr. A's safety and protection, as well as that of his friends and family still in Sudan, is a compelling government interest. Moreover, Mr. A's proposed redactions, which are limited to his personally identifiable information, are narrowly tailored to serve that interest. Thus, regardless of the access standard applied by the Court, it would reach the same conclusions.

[23] Eastern District of Virginia Local Rule 5(C) provides, in pertinent part:

[A] motion to file under seal shall be accompanied by a . . . non-confidential notice that specifically identifies the motion as a sealing motion[.] . . . The notice shall be identified as a notice of filing a motion to seal and it shall inform the parties and non-parties that they may submit memoranda in support of or in opposition to the motion within seven (7) days after the filing of the motion to seal[.] . . . The notice shall also state that any person objecting to the motion must file an objection with the Clerk within seven (7) days after the filing of the motion to seal and that if no objection is filed in a timely manner, the Court may treat the motion as uncontested.

E.D. Va. Local Civ. R. 5(C).

30

23, 31.) The Court received no objections. Second, the Court has considered less drastic alternatives to sealing and finds that Petitioner's requests to seal maximize the public's access to information while protecting Mr. A's personal information. Mr. A contemporaneously filed public versions of each document he seeks to seal with targeted redactions, removing only Petitioner's name, signature, and other personally identifiable information. (*See* ECF Nos. 1, 1-1, 1-2, 1-3, 1-4, 1-5, 1-6 (redacted original petition and accompanying exhibits); ECF Nos. 14, 14-1, 14-2, 14-3, 14-4, 14-5, 14-6, 14-7 (redacted Amended Petition and accompanying exhibits); ECF No. 28-2 (redacted exhibit accompanying Mr. A's reply).) No less drastic alternatives to sealing exist. Third and finally, the Court provides specific reasons and factual findings supporting its decisions for sealing above. *Ashcraft*, 218 F.3d at 302.

Accordingly, the Court will grant Petitioner's Motions to Seal, (ECF Nos. 21, 29), and order that the unredacted exhibits accompanying the original petition, (ECF Nos. 5, 5-1, 5-2, 5-3, 5-4, 5-5), the unredacted Amended Petition and accompanying exhibits, (ECF Nos. 18, 18-1, 18-2, 18-3, 18-4, 18-5, 18-6), and the unredacted exhibit accompanying Mr. A's reply, (ECF No. 32), remain sealed on the docket.

### IV. Conclusion

For the foregoing reasons, Respondents have failed to provide Petitioner with due process of law, and the Court will grant the Amended Petition and order Petitioner's immediate release. The Court will also grant Mr. A's request to proceed using a pseudonym, and his requests to seal.

An appropriate Order shall issue.

Date: 6 / 4 / 26
Richmond, Virginia

/s/
M. Hannah Lauck
Chief United States District Judge

31